# CHARLESTON.

## Powers-Taylor Drug Co. *v.* Faulconer *et als.*

52    581
66    443
f66   444

### Submitted January 23, 1902.   Decided March 28, 1903.

1. Insolvent Debtor—*Preferred Creditors—Fraudulent Intent.*

     Where an insolvent debtor, with intent to prefer certain of his creditors, sells his property to a third party, who is cognizant of the purpose of said sale and participates therein, and the proceeds of sale are paid to certain creditors, leaving others unpaid, and the creditors so preferred are parties to the transaction and enter into it for the purpose of obtaining the preference, such sale is not fraudulent in fact, unless there be evidence sufficient to establish the fraudulent intent, mere intent to prefer being alone insufficient to establish it.   (p. 587).

2. Preferred Creditors—*Assets—Distribution.*

     In such case, however, the preference so given is in violation of section 2 of chapter 74 of the Code, and the preferred creditor must bring· in the money so received to be distributed ratably in payment *pro tanto* of the debts due to him and the creditors, at whose instance the transaction is set aside.   (p. 598).

     Writ of error and *supersedeas* to Circuit Court, Summers County.

     Action by Powers-Taylor Drug Company against F. N. Faulconer, *et als.*   Judgment for plaintiff, and defendant appeals.

                         *Reversed and Remanded.*

     Miller & Read and Charles M. Alderson, for plaintiffs error.

     Boggess & Boggess and R. F. Dunlap, for defendants in in error.

Poffenbarger, Judge:

     J. H. Jordan appeals from a decree of the circuit court of Summers County, holding him liable to the creditors of E. N. Faulconer in the sum of two thousand five hundred dollars, on the theory that he obtained the property of Faulconer by a sale made to him by Faulconer, with intent to hinder, delay and defraud the creditors of the latter.   Faulconer was the owner

of a drug store in Hinton, and having become indebted to the extent of insolvency, he sold his stock of goods and accounts to Jordan for the sum of one thousand and two hundred dollars in cash. In the store there was a soda fountain on which there was a lien for one hundred and fifty-six dollars and ten cents, and this was assumed by Jordan in addition to the one thousand and two hundred dollars. At the time of this sale, some of Faulconer's creditors had obtained judgments against him, amounting to about four hundred dollars, and acquired some execution liens upon the property. Jordan was the cashier of the Bank of Summers, and, at the time of his purchase, that institution held a note of seven hundred and fifty dollars, made by Faulconer and endorsed for his accommodation, it seems, by John W. Flanagan, J. M. Ayers, W. H. Sawyers, H. Ewart and James H. Miller, who are amply good for the amount. It was in part renewal of the one thousand dollar note which had been given some time before and reduced by payment. Out of the purchase money of the drug store, Jordan, by direction of Faulconer, paid said note and the judgments and, after paying some other small amounts, gave Faulconer the balance, amounting to twenty-five dollars and ninety-two cents, part of which Faulconer says he paid out on other debts. Immediately after this transaction, Jordan sold a one-half interest in the drug store to Harrison Gwinn and Wade Gwinn for one thousand and two hundred and fifty dollars, who have, since early in March, 1900, conducted the business under the firm name of Gwinn Drug Store, that being the date of the alleged second sale. It is further shown that Jordan borrowed the money with which he bought the store from the bank, and that in the second transaction Gwinn gave Jordan his note which was also discounted. Some time afterwards, the Powers-Taylor Drug Company and the Owens Minor Drug Company, corporations, brought a suit in the circuit court, under section 2 of chapter 74 of the Code, to have the sale and transactions had by Faulconer, Jordan, the bank and the Gwinns declared a charge and transfer within the meaning of said statute. The bill also attacked the sale as fraudulent in fact, and prayed that it be set aside as to plaintiff's debts; that the preference given to the bank be set aside; that the proceeds of sale be distributed *pro rata* among the creditors who should unite in the suit and con-

tribute to its cost; that a decree be entered against Jordan and the bank for the full amount of the goods, fixtures, etc., and that general relief be granted. The bill was answered by all the parties to the transaction, denying all charges of fraud and intent to hinder and delay the creditors of Faulconer as well as any attempt to create a preference, and also that Jordan, the bank and the Gwinns had any knowledge of any fraudulent intent on the part of Faulconer or of any of the parties, or intent on his part to prefer any of his creditors. The answers were separate and Jordan averred that he purchased in good faith and without any notice of Faulconer's insolvency or of any fraudulent intent on his part. The decree held Jordan liable to the creditors in the sum of two thousand five hundred dollars, required him to pay to the Powers-Taylor Drug Company two hundred and four dollars and forty-five cents and to the Owens Minor Drug Company three hundred and forty-one dollars and seventy-two cents, with interest on both sums from the date of the decree, and the costs, and awarded executions against him, and referred the cause to a commissioner to ascertain the further indebtedness of Faulconer existent at the time of sale. In the appeal from the decree, Faulconer and the Gwinns joined.

As stated in the opening sentence, the decree is predicated upon the finding of actual fraud upon creditors, perpetrated by the appellants or one of them, Faulconer, and knowingly participated in by the others. This finding is based upon evidence tending to show that Jordan and the Gwinns knew of the insolvency of Faulconer, and of his intent to defraud, hinder and delay his creditors, and that the inadequacy of the price paid by Jordan was such as to indicate fraud in the transaction. As strengthening this view, it is pointed out that he disposed of one-half of the property for almost as much as he paid for the whole of it. Another circumstance is that he purchased without having taken an invoice or ascertained, in any other way, just what he was buying. Another is that the accounts due and owing to Faulconer, the amount of which does not appear, were not examined and considered in the negotiation for the purchase, and nothing was said about them except that Jordan made a casual inquiry as to their probable amount, to which Faulconer replied that they might amount

to one thousand dollars, one thousand five hundred dollars or two thousand dollars. Jordan says he inferred from the response that Faulconer did not consider his accounts worth much. It also appears that, at the time of the sale, the Owens Minor Drug Company, and probably other creditors, were pressing Faulconer for payment and had been doing so for some days, and that Sawyers, one of the endorsers of the note held by the bank was aware of it, and there is evidence tending to show that he took part in the sale as an adviser of Faulconer, he being an attorney. James H. Miller, another one of the endorsers, at the instance of Jordan, ascertained the liens and judgments against Faulconer and had something to do with the sale made by Jordan to the Gwinns. Jordan testified that he proposed his purchase to Faulconer, who first declined to sell at the price offered and finally paid, but afterwards returned and said he had concluded to sell at that price and, as a reason therefor, stated that there were some judgments against him. According to the testimony of Faulconer and Jordan, this proposition was made with the view and purpose of buying and then reselling to Gwinn, who had, before that time, asked Jordan to notify him if he found an opening for a drug business, Gwinn then having a son at Richmond engaged in the drug business. On the morning of the day before the proposition was made by Jordan to Faulconer, or by Faulconer to Jordan, for they differ as to who made it, Sawyer had asked Jordan if he knew of anybody who wanted to buy a drug store. Jordan then telephoned inquiry to Gwinn, who replied that he still wanted to locate his son in the drug business. Then Jordan made his proposition and Faulconer accepted, as has been stated. Before reselling to Gwinn, Jordan invoiced the goods and it does not appear just what the invoice showed. Some time after the sale of the interest to Gwinn, he consolidated his own drug store with the one owned by him and Jordan, and it appears that Faulconer remained in the store for a time as a clerk.

Unless the alleged inadequacy of price is accepted as a controlling circumstance in the case, the evidence undoubtedly establishes that Jordan had no intent or purpose other than to prefer his creditors. What was done by Sawyer, Miller and the bank, conceding all that is claimed against them in the

way of participation, imports nothing more than a purpose and design to obtain payment of the note held by the bank and endorsed by some of the alleged actors. This could not be done by a purchase of the property to the exclusion of those creditors who held execution liens. Hence, it was necessary to its accomplishment that these creditors should be paid. It does not appear that, in attempting to do this, these endorsers and the bank endeavored to give Faulconer any personal advantage, nor that he endeavored to obtain such advantage. All of the purchase money, according to the evidence, with the possible exception of four or five dollars, went to the creditors and nothing was left to Faulconer. In its most unfavorable light, therefore, it was a conversion of the property into money by sale, and payment of the whole proceeds upon certain debts, leaving others unpaid and leaving the debtor entirely stripped of his property. At the very root and basis of the law of fraudulent conveyances lies a secret trust or advantage secured to the grantor by the conveyance, which puts upon the transaction the character of fraud, and conclusively establishes the intent on the part of the grantor to hinder and delay his creditors and prevent them from reaching his property, while he, in a secret manner and upon a secret trust, contrary to the purpose of his conveyance, holds on to his property or a part of it. All of this is clearly and effectually negatived and precluded by the evidence in this case. In thus disposing of his property at private sale and preferring certain of his creditors, contrary to the statute, though it be, Faulconer says he obtained more money for it than it would have brought at public sale. If so, he thereby obtained the advantage of reducing his indebtedness by sale of his property to a sum less than would have existed, after the sale of his property under executions and the application of its proceeds, but by so doing he whithheld no part of the property or its proceeds from his creditors. Granting that it was his purpose to obtain the highest price possible for his property and thus reduce his indebtedness as much as possible, it does not make the transaction fraudulent, although in effectuating this purpose he violated the statute against preference. No discussion of this proposition is necessary, for the principle is clearly announced in the well written opinion in *Herold* v. *Barlow,* 47 W. Va. 750, 755.

· The alleged inadequacy of price is not sufficient to overthrow the intent and purpose which so clearly appears from all the evidence and circumstances. On the assumption that the value of the store and accounts was two thousand five hundred dollars, Jordan paid a little more than one-half of that value, but it would be unsafe to stand upon that valuation, for it is by no means established by the evidence. · All that appears in support of that is Jordan's claim that he sold a half interest for one thousand two hundred and fifty dollars, and that the invoice taken at that time is said to have amounted to two thousand five hundred dollars. This is entitled to but little weight. While Jordan says he retained an interest, he did so for only a short time. The Gwinns took all the property, and there is no intimation that Jordan received any thing but the note. On the whole, about one thousand two hundred dollars seems to have been the real amount of money involved in each transaction. There is no evidence directly indicating what the actual cash value of the stock of goods and accounts was, or what they would have brought at a sale. The notes and accounts are spoken of disparagingly and there is no evidence tending to show that they were of any considerable value. But the question here is not what the property was worth. It is whether Jordan or Gwinn was a *bona fide* purchaser and the inadequacy of price is only a circumstance indicating *mala fides.* It must be such inadequacy as makes it a badge of fraud, and that requires such inadequacy as to make the transaction unreasonable and unconscionable, not merely such as indicates that a good bargain was made by the purchaser. The latter is all that can be said of the inadequacy in this case. Hence, it is wholly insufficient to brand the sale as fraudulent.

Having thus determined that the sale is not infected with fraud in fact, so as to make it void as against creditors, it remains to inquire whether the transaction falls under the ban of the statute against preferences. For the appellants, it is insisted that the case is within the principle announced in *Merchants & Co.* v. *Whitescarver,* 47 W. Va. 361, where it is held that an insolvent debtor may sell his stock of merchandise to a disinterested party, take his notes in payment therefor, and assign the notes in payment of a debt, due to a *bona fide* creditor. If the facts disclosed by the evidence placed this case

on the footing of the one just referred to, and made it necessary to pass upon the soundness of that decision, I should be inclined to question it. It enables an insolvent debtor to do indirectly what he is forbidden to do directly by the plain and express language of the statute, namely, to turn his property over to a part of his creditors to the exclusion of others. It is claimed that warrant for this is found in the last clause of section 2 of chapter 74 of the Code, which enables the insolvent debtor to transfer bonds, notes, securities or other evidences of debt in payment of, or as collateral security for, the payment of a *bona fide* debt, or to secure any indorser or surety, whether such a transfer is made at the time such debt is contracted or endorsement made, or for the payment or security of a pre-existing debt. This cause neither expressly authorizes the sale or transfer of any property to be so applied nor the conversion of property into notes or money for such application. It deals with evidences of debt only. The first part of the section says that every transfer, which includes a sale, or charge made by an insolvent debtor attempting to prefer any creditor of such insolvent debtor or to secure such a creditor or any surety or endorser for a debt, to the exclusion or prejudice of any other creditor, shall be void as to such preference or security, but shall be taken to be for the benefit of all creditors of such debtor, and all the property so attempted to be transferred or charged shall be applied and paid *pro rata* upon all the debts owed by such debtor at the time such transfer or charge is made. This part of the section forbids the gift, sale, conveyance or assignment by an insolvent debtor of any of his property, whatever its form, so as to create a preference. But for the proviso at the end of the section, nothing could be so disposed of by him. How far does it qualify the general inhibition of acts by an insolvent debtor? Only to the extent that he may so dispose of paper representing indebtedness due to him. To hold that he may convert his property into money or notes and turn them over to his creditors, simply undermines the statute and virtually destroys it and defeats its whole purpose. It is no answer to this to say that the staute permits the owner of property, although insolvent, to dispose of it by sale to a *bona fide* purchaser and pay the proceeds on his indebtedness in the ordinary course of business. A mercantile house,

open and running in the usual way, although the owner is insolvent, differs widely from such a house closed, with its owner insolvent, and having passed the title to some one else, and the proceeds of the sale of the entire business and property handed over to a part of the creditors to the exclusion of the others. Such a transaction is an act of insolvency. It is such a sale as the statute contemplates shall be taken for the benefit of all the creditors, and fixes upon the property, or its proceeds, the character of a trust fund which may be followed up by the injured creditors in the manner prescribed by statute. If the purchaser has not paid all the purchase money, it is liable in his hands. Such creditors as have been paid ought to be compelled to refund a proper proportion to the end that the purpose of the statute may be effectuated. The distinction adverted to between sales made by an insolvent debtor in the ordinary course of business, and the sale of all his property, or such a portion of it as clearly shows a purpose to quit business, is plainly stated in the great case of *Curtis* v. *Leavitt,* 15 N. Y., the opinions in which cover nearly three hundred pages. It was not the case of a sale to a *bona fide* purchaser, but an encumbrance, in respect to which the question arose whether it was within the New York statute against fraudulent conveyances and preferences by moneyed corporations. One point of the syllabus reads as follows: "But where an insolvent or failing debtor proposes to stop business and wind up his affairs, and for that purpose assigns the whole or the mass of his property, he must devote it unconditionally to the payment of his debts. He can make no reservation in his own favor, until all his creditors are satisfied. The adjudged cases on the subject go upon this principle; but the principle has no application to transactions like those now in question." The principle which was held to apply and govern that case was that where, "There is no evidence of any intent to delay or defraud creditors, but on the contrary the evidence proves a design and expectation of going on in business, and paying all debts as fast as they matured; and the trust deeds were made to raise money in order to enable the company thus to go on and pay its debts; * * *. The reservation in the deeds, for the benefit of the company, were appropriate to such a transaction, and in themselves were innocent and lawful." Our statute is not so liberal in respect

to the charges upon the property of an insolvent debtor. On the fact of his insolvency, everything turns, and intent of the parties to the transaction by which a preference is given, is not taken into account. The word sale, as used in this statute, is not expressly limited to a sale to the creditor. Whether it is to be so limited, is matter of construction, and the construction of the statute ought to be such as to give it the effect intended by the legislature, so far as that intent is made plainly manifest by the statute. The force and effect of the statute ought not to be frittered away by refinement and technicality. Certainly not, by a mere play upon words. This statute is in derogation of the common law, it is true, and ought not to be so construed as to be carried beyond the purpose for which it was passed. But it ought to be liberally expounded for the accomplishment of that salutary purpose, the ratable distribution of the assets of an insolvent person among his creditors. That is nothing more than equity, equality.

In this view, however, the majority of the court do not concur. But we hold that where the insolvent debtor, the purchaser and the preferred creditors all join in the design to give preference and execute that purpose by a sale of the property and payment of the proceeds thereof to certain creditors, to the exclusion of others, the preference so given is within the statute and will be set aside and the fund thus diverted will be apportioned among the preferred creditors and the unsecured creditors who attack the transaction within the time and in the manner prescribed by the statute. In the first case decided by this Court under the present statute, *Wolf* v. *McGugin,* 37 W. Va. 552, JUDGE BRANNON, speaking for the Court, said: "No matter is it if Armstrong were not a creditor. The debts are preferred. As indicated above, my opinion is that, if a person purchase property of an insolvent debtor, not for cash, but agree as a part of the transaction to devote the consideration to pay certain creditors of the seller to the exclusion of others, that is an act falling under the bar of the statute, though such purchaser be not a creditor. He is a party to the very act prohibited —that of applying the insolvent's estate to certain preferred creditors." In point three of the syllabus, it is held that, "The form of the instrument or act, by which the preference forbid-

den by the statute, whether by deed of trust, assignment or sale is accomplished, is not material, so that it results in such a preference, it being the design of the statute to prevent an insolvent debtor from devoting his property to work a preference among his creditors." It may be said that this case does not fall within the express terms used in *Wolf* v. *McGugin,* but it is undoubtedly within the spirit of that decision as well as the design and spirit of the statute, if the evidence establishes that the Bank of Summers, the preferred creditor, Jordan, the purchaser, and Faulconer, the insolvent debtor, performed their respective parts in this transaction with the purpose and design to give the preference. This is denied by all these parties. But what rule of evidence shall be applied? May not the real character of the transaction be established by the relation and conduct of the parties and the surrounding circumstances, as in the case of fraudulent conveyances, despite the protestation of the parties to the contrary. Here, the purchaser was the cashier of the bank. He says he resold to Gwinn who was the president of the bank. The purchase money was borrowed by Jordan from the bank and then he took Gwinn's note for one thousand two hundred and fifty dollars and discounted that in the bank. It is to be noted here that the fifty dollars added in the Gwinn note was only two dollars more than the discount on the two notes for four months at the rate of six per cent, which strongly indicates that Jordan was a mere instrument or agent in the transaction, Gwinn paying all the expenses. On the face of the matter, there is another significant indication, and that is that Jordan was only nominally a co-owner with Gwinn after the alleged resale to him. Shortly after this transaction, Gwinn consolidated with the Faulconer Drug Store another drug store, and then Jordan ceased to be an interested party, but it does not appear, and is not intimated, that he ever received anything from Gwinn by way of payment for the property except the one one thousand two hundred and fifty dollar note. It is also admitted that two of the endorsers on that note were officers and stockholders of the bank. Whether they were Sawyer and Miller, who took part in this transaction as attorneys, the one representing Faulconer, and the other Jordan, is not shown by the testimony, but the fact remains that officers and stockholders of the bank were endorsers and were benefited by this

preference, a circumstance rendering it probable that the bank may have been induced to do just what it is charged it did do. It appears also that the transaction was consummated at the bank and that Jordan did not allow the purchase money to go out of his hands, but paid it directly to the bank and the justice, in whose court the judgment against Faulconer had been recovered, all by direction of Faulconer. Both he and Jordan protest that this was not by prior agreement, and that the direction was given after the sale was consummated, but the transactions were all so nearly contemporaneous and so related and intertwined with one another that they may be viewed as a single occurrence, and that what was actually done was the thing agreed to be done. If the bank stands upon the same footing as an individual would stand upon in a like transaction, it would undoubtedly be charged with having obtained a preference. Ordinarily, the proof required to charge a corporation differs from what is required in the case of an individual. Corporations act only through their agents, and the power of an agent is always limited. The governing power, under the charter and by-laws, is the board of directors, and the president and other managing officers, though clothed with great power and responsibility, do not bind the corporation unless acting within the scope of their authority. For this reason, there has been conflict of opinion both here and in England as to whether a corporation is liable for the fraud and false representations of its officers and agents. But it is now well settled in this country that they are if the officer or agent, when perpetrating the fraud or making a false representation, is acting within the general scope of his authority. 7 Am. & Eng. Enc. Law, (2d ed.) 830, 831. Here, it is not a question of the proof of fraud, but it is analagous, for it is the question of an agreement of a corporation to obtain a preference contrary to the statute and the consummation of that agreement, and the actual appropriation to its own use of money which the statute declares shall belong to all the creditors. It certainly requires, not more, but less, proof, in such a case, than in an effort to charge the corporation with fraud. It is certainly within the general scope of the powers of the president and cashier of a bank, for it relates to the collection of a debt, a thing which falls peculiarly within the power of the officers of a bank. "By

the weight of authority, when an officer of a corporation does an act which constitutes a fraud upon a third person, or upon another corporation, of which he is also an officer, the first mentioned corporation is chargeable with notice of the nature of the transaction, although the fraud is perpetrated for his own benefit, where he also represents the corporation in the transaction." Clark on Corp. 2195. "The position of defendant's counsel, that one of its executive officers may have proper notice of a fact which should control its action and concealing it allows its other officers to act adverse to the interests of the party for whose benefit the notice enures and that such adverse action is legal, is not sound. * * * It was the duty of the officer receiving such notice to advise all other employes of such fact, and the bank would be none the less concluded by it if he failed to do so." *Gelman* v. *Second National Bank,* 23 Hun. 498, 503; *Ingalls* v. *Morgan,* 10 N. Y. 178; *Weisser* v. *Denison, Id.* 68; *Bank* v. *Canal Co.,* 4 Paige 127; *Railroad Co.* v. *Schuyler,* 34 N. Y. 30. No good reason can be assigned for holding that the purpose and design imputed to the Bank of Summers and its participation, by its officers, in the transfer by which it obtained a preference, cannot be established against it by circumstantial evidence, and the circumstantial evidence bearing upon that question is abundantly sufficient. Hence, the circuit court should have compelled said bank to pay the plaintiffs their *pro rata* share of the seven hundred and fifty dollars which it received.

For the reasons given, the decree complained of must be wholly reversed, and the cause remanded with directions to enter a proper decree, requiring the Bank of Summers to pay, out of said sum of seven hundred and fifty dollars, to the plaintiffs, their *pro rata* shares of the residue thereof, allowing the bank, of course, to participate with them *pro rata* in the distribution of said fund.

*Reversed and Remanded.*

McWHORTER, PRESIDENT, (*dissenting*):

Powers Taylor Drug Co., and Owens Minor Drug Co., corporations who sued on behalf of themselves and such other creditors of E. N. Faulconer, as should come in and contribute to the costs of the suit, filed their bill in equity in the circuit court

of Summers County against E. N. Faulconer and John H. Jordon in his own right and as cashier of the Bank of Summers, the Bank of Summers a corporation and Harrison Gwinn and Wade Gwinn, partners as the Gwinn Drug Store; setting up their respective claims, which had been reduced to judgments, against defendant Faulconer, alleging that he had been engaged in the drug business at Hinton and having become involved to the extent of hopeless insolvency and being in debt to the Bank of Summers in the sum of seven hundred and fifty dollars; that said Faulconer was the owner of a stock of drugs, fixtures, etc., then in his store in the city of Hinton, of the value of one thousand five hundred dollars, and also was the owner of certain book accounts, notes, claims and demands due and owing to him of the value of $————; that on the 26th day of February, 1900, said Faulconer attempted to sell and transfer the said stock of goods, accounts, claims, etc., to the defendant, John H. Jordon, cashier of the Bank of Summers; that the only consideration paid for said stock of drugs, fixtures, book accounts, claims, etc., by the said Jordon cashier was the payment of a note of about seven hundred and fifty dollars due the defendant Bank of Summers by said Faulconer; that the sale of said stock of goods, etc., was made by the said defendant, Faulconer for the purpose and with the intent to hinder, delay and defraud his creditors, and that the said sale and transfer did delay and defraud said creditors, and especially plaintiffs, and that said defendant, John H. Jordon and John H. Jordon, cashier, of the Bank of Summers and the said bank had notice of the fraudulent intent and purpose of the said Faulconer in making said sale and transfer, and participated in the said fraud by aiding and abetting him; and that said sale and transfer were attempted on the part of the said Faulconer who was then insolvent and whose insolvency was known to said Jordon and to the bank, to give preference and priority to the said bank by securing the bank said note of seven hundred and fifty dollars and by such sale and transfer did give the said bank a preference to the exclusion and prejudice of the other creditors; and that the sale and transfer were null and void as to said preference, even if there was no actual fraud in the transaction; that said goods, fixtures, accounts, etc., shall be taken for the benefit of

all the creditors of Faulconer and applied and paid *pro rata* upon all his debts or such as should come in and contribute to the cost of the suit; that said stock of drugs, fixtures, etc.. were attempted to be sold and transferred without any invoice or any steps being taken to ascertain their true value, and that no consideration, whatever was taken of the value of the said stock, but that the sale and transfer were made solely for the purpose of saving the debt due to the Bank of Summers, to the exclusion and prejudice and in fraud of the rights of the other creditors of said Faulconer, and alleging that said bank and Jordon should be held for the full amount of the value of said stock of drugs, fixtures, book. accounts, claims, notes, demands, etc., that went into the hands of said Jordon and said Bank of Summers by reason of the attempted sale and transfer. They further alleged that some days after the said sale and transfer the defendants, Jordon and the Bank made sale of the said stock of goods and fixtures to the defendants, Harrison Gwinn and Wade Gwinn, partners as the Gwinn Drug Store, in whose possession said drugs, goods, fixtures, etc., were, and being sold my them; and that said Gwinn Drug Store became the purchaser thereof with full knowledge of the facts and circumstances of the attempted sale and transfer by Faulconer to the defendants Jordan and the Bank of Summers, and praying that the attempted sale and transfer be set aside and held for naught as to plaintiff's debts, that the preference given to the Bank of Summers in order to exclude and prejudice the other creditors of said Faulconer be set aside; that the proceeds of' said sale be proportioned *pro rata* among all the creditors of said Faulconer, who will contribute to the cost of the suit; that a decree be entered against said Jordon and the bank for the full amount of the goods, fixtures, accounts, etc., that was received by them by reason of said attempted sale and transfer; that all proper inquiries be made and accounts taken, and for general relief. The defendants, John H. Jordan and Wade Gwinn filed their demurrers; the defendants, J, H. Jordon, E. N. Faulconer and J. H. Jordon, cashier of the Bank of Summers, filed their separate demurrers and answers in all of which demurrers plaintiffs joined and replied generally to the answer. The demurrers being considered were overruled. John H. Jordon filed his answer as cashier,

averring that the Bank of Summers was a corporation doing a banking business in the city of Hinton; that they were then informed that defendant Faulconer was not solvent on February 26, 1900, but that they were not aware of the fact at that time, that the bank was the holder and owner of a note for seven hundred and fifty dollars made by defendant Faulconer, and payable to John W. Flannagan, J. M. Ayers. W. H. Sawyers, H. Ewart and James H. Miller and endorsed by them to the bank; that said note was one of a series of renewals of a note given more than a year before and had been curtailed from one thousand dollars to seven hundred and fifty dollars; that said endorsers on said note were perfectly and absolutely solvent on the 26th day of February, 1900, and were still solvent; that said bank did not desire the collection or payment of said note; and that the solvency or insolvency of the defendant Faulconer could not in any way affect said bank and denying that either he as cashier or the bank had any transaction with said Faulconer with respect to the sale or purchase of said property of Faulconer or of any part of it; that after said sale was made Faulconer paid said note as they were informed out of the proceeds of said sale; that the said bank nor said Jordon, cashier, had any interest in said sale or any connection therewith or with the application of the proceeds; but admitted that a sale was made to Jordon on his own individual account, but neither said bank nor its officers had any interest or transaction with said Faulconer, and denied emphatically that the only consideration for the property sold was the payment of said note of seven hundred and fifty dollars, but averred that the actual consideration paid, by Jordon in his own name, was one thousand two hundred dollars in cash and the assumption by him of a lien recorded of James W. Tufts against the soda fountain including the said sale of about one hundred and fifty dollars, and also of the payment of twenty dollars on account of rents, and denied all fraud or knowledge of fraud in any transaction or that there was any action or transaction on their part to give preference to any creditor of said Faulconer by which any preference or priority might be secured or the rights of any creditor be prejudiced, or that they were liable in any way for the transaction of said Faulconer or any other person or that said sale and transfer

were made for the purpose of saving the debt due by Faulconer to the bank or that the stock of merchandise, drugs, etc., went into the hands of either Jordon, cashier, or the bank, or that either of them sold or transferred the property to defendants, Gwinns or either of them or to any person. J. H. Jordon in his separate answer denied all allegations of fraud or fraudulent intent or knowledge of fraud and denied all material allegations of the bill; alleged that he bought the goods for one thousand two hundred dollars cash and assumed the trust debt lien upon the soda fountain due James W. Tufts for one hundred and fifty-six dollars and ten cents; that he borrowed the one thousand two hundred dollars from the Bank of Summers, making his note therefor, which was endorsed by James H. Miller; that out of the one thousand two hundred dollars so borrowed and paid to Faulconer, seven hundred and fifty dollars was paid to the bank at Faulconer's direction to pay the note for that amount and he also paid execution liens in the hands of constable on said property amounting to about four hundred dollars, which were paid by direction of said Faulconer, and the residue paid to Faulconer in cash; that said bank had no interest in securing a preference of in buying or attempting to consummate said sale as its debt represented by said note was perfectly and absolutely safe and secure as each endorser was solvent and good for the amount thereof; that respondent did not know the financial condition of Faulconer and had no knowledge thereof except to the extent of said liens and debts due to the bank, and when he decided to purchase said stock he examined all of the records to see what if any liens were against the property; that the payment to the bank was not made at the suggestion of respondent as it was not a lien against the property; that after his purchase was made respondent informed H. Gwinn, who acceded thereto, and he and his son Wade came to Hinton and Gwinn immediately repaid respondent the amount of his cash payment and he turned the business property and stock over to them, the Gwinns to take it as of the date of respondent's purchase of February 26, and of the one thousand two hundred dollars paid by them to him he paid off his note in bank and the business had since the 6th of March, 1900, the date when Gwinns refunded to him his money been run in the name of Gwinn Drug

Store; and filed with his answer the original contract of purchase, and alleged that the purchase was made in the utmost good faith and without any intention of affecting the creditors of said Faulconer by preference or prejudicing in the least any one, and denied that any sale or transfer was made by any person to the Gwinns, except himself. The defendant, Faulconer in his answer admitted his liability for the claims of the plaintiffs and averred that he intended to pay them as soon as he could; that he had been unfortunate in business and was not able to pay, denied all allegations of fraud or knowledge of fraud contained in said bill; that he became involved with his creditors and was unable to pay them as fast as their claims became due; that a number of judgments were procured against him and executions issued prior to the 26th of February, 1900, and not being able to meet all his liabilities decided to sell his stock of drugs, went to see Jordon and after considerable negotiation they agreed on the sale and the property was turned over to him, the price paid by Jordon was one thousand two hundred dollars and the assumption of the Tufts debt of one hundred and fifty-six dollars and ten cents secured by lien, which was, as respondent believed, a fair price and considerably more than could have been realized out of the property at forced sale. The sale was made only in the interest, as he conceived, of his creditors; that the debt owing to the bank was not mentioned between them until after the sale was made, then at the instance of respondent the debt was paid to the bank; that he desired the bank debt first paid; because when he first went into business he borrowed one thousand dollars, all of which was applied in the payment of the purchase money for the stock and his friends, the endorsers, had endorsed the note to give him a start, and it had been renewed from time to time and curtailed until the balance due on last renewal was seven hundred and fifty dollars; that after the payment of said sum and four hundred dollars to pay off the liens and executions against said stock, of the one thousand two hundred dollars, there was a balance of twenty-five dollars and ninety-two cents, all of which he paid out on other debts due by him; denied that Jordon, as cashier, or the bank had anything to do with the said sale so far as he knew; that the sale was made in absolute good faith and without fraud, or fraudulent intention and

neither Jordon, nor either of the Gwinns had any information of the insolvency or the extent of the indebtedness of respondent; that there was no contract express or implied between any of the parties to said sale except that contained in the written agreement between Jordon and himself of the 26th of February, and the consideration as therein stated; and denied that the sale was made with the intent to hinder or delay creditors or that said sale and transfer did so hinder and delay and defraud his creditors or either of them; and denied that Jordon or any other person had knowledge of any such intention, as none such existed, or that Jordon or any one else aided or abetted in such transaction or that any one knew that respondent was insolvent at the date of the sale and denied that such sale and transfer was an attempt to give preference and priority to any person or that the sale was made in order to give said bank preference on account of its debt or to save the said debt to the bank, and alleged that said property was sold to Jordon at a reasonable and fair price and for much more than it would have brought at forced sale under legal process; that after said sale to Jordon the property was turned over to the defendants Gwinns, but of that transfer and the terms thereof respondent was not advised; that he was employed to assist said Wade Gwinn at a salary of fifty dollars per month and the salary was all the interest he had in the business. · The depositions of defendant, H. Gwinn and of R. E. Dunlap, attorney for plaintiffs were taken and filed on behalf of plaintiffs and the depositions of defendants, Faulconer and Jordon were taken on behalf of defendants and filed in the cause. On the 14th of February, 1901, the defendant, E. N. Faulconer, tendered his petition showing that after the sale of his drug business he had filed his petition in bankruptcy in the District Court of the United States for the District of West Virginia, and that on the 10th day of September, 1900, he was adjudged a bankrupt; that plaintiffs were included in his petition and scheduled and had actual notice of the proceedings; that the debts of plaintiffs were 'such as would be released by a discharge in bankruptcy, and that this suit was founded upon a claim from which a discharge would be a release; and averred that no adjudication or decree could be entered in said chancery cause against him or in any wise affect

his interest until said matters were adjudicated by the bankruptcy court; and that said suit could not be finally heard and the matters therein determined at that time, and praying that the plaintiffs be made parties to the petition; and that the suit be stayed as provided by the bankruptcy laws and for general relief, to the filing of which petition plaintiffs objected, the objection was overruled and the petition filed and process thereon was waived by the plaintiffs as well as by defendants, Jordon and the bank, and plaintiffs replied generally to the petition and on the same day the cause came on to be heard on the bill and exhibits filed, and the said answers and exhibits and general replication to all the answers, upon the depositions and upon the petition of Faulconer, which was treated as his amended answer, and general replication thereto, and all the proceeding theretofore had and papers read, and the court being of opinion that the sale of the stock of drugs, etc., was made by Faulconer to Jordon with the intent and for the purpose of hindering, delaying and defrauding the creditors of Faulconer, and that Jordon the purchaser had notice of such fraudulent intent on the part of Faulconer and the sale was for a grossly inadequate consideration, and that the sale and transfer was for the benefit of all of Faulconer's creditors and that the said Jordon was liable to the creditors of said Faulconer for two thousand five hundred dollars, the full value of said stock of drugs, etc., shown by the invoice made in the sale to H. Gwinn, said Jordon having disposed of the stock of drugs, etc., and decreed that Jordon be held liable to the creditors of Faulconer for the said sum of two thousand five hundred dollars; and that plaintiffs, The Powers Taylor Drug Co., and Owens Minor Drug Co., by reason of the institution of this suit and being the only creditors up to the time who had united in the suit and contributed to the expenses thereof were entitled to the payment of their debts in full and decreed to said Powers Taylor Drug Co., two hundred and four dollars and forty-five cents; to the Owens Minor Drug Co., three hundred and forty-one dollars and seventy-two cents, against said John H. Jordon, with interest from the date of the decree on said sums and the costs of their suits, and execution awarded against Jordon, in favor of the plaintiffs, respectively for said sums and costs, and the cause was referred to a commissioner to

ascertain the further indebtedness of the said Faulconer which existed at the time of sale; from which decree the defendants, J. H. Jordon, E. N. Faulconer, H. Gwinn and W. Gwinn appealed. The first assignment of error is in overruling the demurrer to plaintiffs' bill; it is claimed by appellants that all lien creditors of Faulconer were proper and necessary parties to the bill. In Hogg's Eq. Pr., sec. 184, it is said, "In a suit to set aside a conveyance as fraudulent and subject the property embraced therein or so much thereof as is necessary to the plaintiff's debt, it is not necessary to convene the other creditors of the debtor and ascertain the liens; but the parties directly concerned and connected with the conveyance or interested as grantees or assignees must be before the court in order that full determination of the matter binding all parties interested may be had in the cause, but further than this the rule does not extend." *State* v. *Bowen,* 38 W. Va. 91; *Core* v. *Cunningham,* 27 W. Va. 206; *Blubaugh* v. *Loomis,* 48 W. Va. 666; (37 S. E. 794); *Pethtel* v. *McCullough,* 49 W. Va. 520; (39 S. E. 199). Appellants cite *Hill* v. *Proctor,* 10 W. Va., and *Livesay* v. *Feamster,* 21 W. Va. (pt. 5 Syl). In the first of said causes it is held that "All persons materially interested in the subject of controversy ought to be made parties in equity, and if they are not the defect may be taken advantage of, either by demurrer or by the court at the hearing." This was a suit to enforce the specific performance of a contract of sale of real estate against the heirs of Joseph C. Kendall, when parties who claimed an interest in the land were not made parties and who were necessary parties to the suit in order that the rights of all might be adjudicated therein. The case of *Livesay* v. *Feamster* was a suit brought by a judgment creditor to enforce his judgment lien, where it was held that he should have made formal defendants to his suit all creditors who had obtained judgments against the debtor in the courts in the county wherein the lands were situated, which he sought to subject to his judgment.

James W. Tufts who had the trust deed on the soda fountain, it is claimed was a necessary party; but his interest could not be affected by anything done in the suit, and Jordon, the purchaser of the goods had assumed the payment of his claim and the list of execution lien creditors filed with the demurrer

of the Gwinns, had been paid off by Jordon at the direction of Faulconer and they had no interest in the suit. The second assignment is that after overruling the demurrer of the Gwinns it was error to decree on the merits of the cause; that a rule should have been awarded against them to answer the bill. The decree is simply a personal decree against John H. Jordon who had answered the bill and the rights and interests of the Gwinns were in no way affected by the decree, sec. 30, ch. 125, Code, 1899, requiring a rule against the defendant to answer the bill after his demurrer is overruled, can only apply to a defendant whose interest will be affected by the decree. The defendant Jordon is the only party whose interests are in any way affected by the decree, and he was in no wise prejudiced by failure to award a rule against the Gwinns to answer, hence he can not complain; and it is insisted by the appellees that the Gwinns not in any manner being affected by the decree the same being in no wise prejudicial to their interest or rights the appeal should be dismissed as to them. *Moran* v. *Clark,* 30 W. Va. 358, (Syl. pt. 7), "The Appellate Court will not reverse a decree unless it is to the prejudice of the appellant" and if a failure to award the rule against the Gwinns was error, not being prejudicial to any of the appellants it would not be cause for reversal of the decree. *Clark* v. *Johnson,* 15 W. Va. 804 (Syl.), "It is not sufficient to reverse a decree that there is error in it, the error must be prejudicial to the appellant or it will not be reversed on his application." The appeal should be dismissed as to the defendants, Gwinns.

The third assignment of error is in holding the sale to Jordon by Faulconer to have been with intent to hinder, delay and defraud the creditors of Faulconer. It is true defendant Jordon in his answer denies all the allegations of fraud; but he knew of the failing financial condition of defendant Faulconer, he knew that he was largely in debt; Faulconer had gone to him and told him his circumstances; that there were judgments against him up there in court, "That these people were pushing me and if it was about to be sold that the price would not amount to anything and that if I could sell I would rather do it. And Mr. Jordon said he was authorized to invest one thousand two hundred dollars by Mr. Gwinn, and I knew that would be more than I could get if it was sold."

It is difficult to determine from the answer of Jordon whether he bought the property for himself or for Gwinn. He says that when he learned that Faulconer desired to sell he communicated with Gwinn by telephone, who was absent, sick, and Gwinn directed him to go ahead and make the purchase; that after a careful inspection of the property he purchased the entire stock and property for one thousand two hundred dollars, cash, and assumed the Tufts lien for one hundred and fifty-six dollars and ten cents; he says Gwinn not being able to be present respondent made the purchase in his own name; that after the purchase was made he informed H. Gwinn who acceded thereto and immediately thereafter Gwinn repaid respondent the amount of his cash payment and he turned the business, property and stock over to the Gwinns who took it as of the date of his purchase. In his deposition he states that after making an investigation and figuring on what Faulconer actually had there he made the purchase without any actual inventory; says he never had any experience in the drug business before this transaction; that he took a business man's precaution in looking after the debts and liens against the stock and had an inventory taken of the stock after the purchase and before he sold, but did not remember exactly what the invoice amounted to nor the definite value that was placed on the stock as to the invoice. The Gwinns gave him their note for one thousand two hundred and fifty dollars, and asked him to remain or retain an interest in the business for a while. While Jordon claims that he did not know the extent of the indebtedness of Faulconer he must have known that he was at the time insolvent. Faulconer admits that at the time he was insolvent, and Jordon says that he looked after the debts and liens against the stock. Positive proof to establish a fraud is not required. In *Richardson* v. *Ralphsnyder,* 40 W. Va. 15 (Syl. pt. 1), it is held: "In showing the fraud necessary to impeach a conveyance, the fraudulent intent of the parties may be shown by the circumstances attending the transaction. Circumstantial evidence is not only sufficient, but is often the only evidence that can be adduced." *Goshorn* v. *Snodgrass,* 17 W. Va. 717; and Bump on Fraud. Con., sec. 184. "It is not necessary that the grantee shall have actual knowledge of the debtor's intent to delay, hinder, or defraud his creditors in

order to render the transfer void. A knowledge of facts sufficient to excite the suspicion of a prudent man and to put him on the inquiry, or to lead a person of ordinary perception to infer fraud, or the means of knowing by the use of ordinary diligence, amounts to notice and is equivalent to actual knowledge in contemplation of law. The nature and circumstances of the transaction may sometimes be such as must apprise the grantee of its character and object. Things speak for themselves. If he has notice of facts sufficient to put him on the inquiry, he can not be deemed a *bona fide* purchaser;" and in section 494, "The notice of the fraud need only be sufficient to put a man of ordinary prudence and experience in business transactions upon the inquiry;" and section 379, Wait on Fraud. Con.; *Shealy* v. *Edwards,* 75 Ala. 411; *Temple* v. *Smith,* 13 Neb. 513. While it is a fact that both Jordon and Faulconer say that Jordon did not know the extent of Faulconer's indebtedness yet he was told by Faulconer that debts were pushing him and that he was likely to be sold out, which was certainly enough to put Jordon upon his inquiry and it does not appear that he even pursued such inquiry beyond the execution creditors; did not even seek to learn from Faulconer whether he had further indebtedness, but only seemed desirous to find what claims were liens upon the property he was purchasing. It was his duty at least to have had such information as Faulconer was able to give him in relation to his indebtedness. He purchased all the property of which Faulconer was possessed. The sale by a debtor who is seriously involved of the whole of his property has been held to create a violent presumption of a fraudulent intent so far as existing creditors were concerned. See Wait on Fraud. Con., sec. 231 and cases there cited.

In *Butler* v. *Thompson,* 45 W. Va. 660 (Syl. pt. 2), it is held: "Conveyance made by a party of his entire property during the pendency of a suit brought to recover judgments against him on a debt is a badge of fraud." The transfer of a debtor's property during the pendency of a suit, or when he is expecting to be sued and pressed on his debts is a badge of fraud. As stated in section 50, Bump on Fraud. Con: "Because a transfer tends to deprive the creditor of the means of enforcing his judgment when he obtains it. If an attorney

who holds a claim for collection is induced to delay the insti-
tuiton of a suit at the request of the debtor who thereupon
takes advantage of the delay to make a conveyance, this is
a badge of fraud the same as after the suit were actually pend-
ing," and cases cited.    Several days prior to the sale by Faul-
coner attorneys for plaintiff, the Owens Minor Drug Co., had
been pressing Faulconer for a settlement and payment and he
had been putting them off from day to day and asking them
to delay proceedings, which they did at his instance, and tak-
ing advantage of their leniency conveyed his property before
they brought their suit.    "The circumstance of looseness in
determining the value of the property conveyed, as when a
purchaser buys a stock of merchandise without taking an in-
ventory of its value though it does not render the sale void
*per se* is a badge of fraud." . 14 A & E., E. L. (2d ed.) 516;
*Moore* v. *Roe,* 35 N. J. Eq. 90.    It seems that Jordon pur-
chased without knowing anything about the accounts due to
Faulconer, did not even look into them, being well acquainted
with the people of Hinton and vicinity and occupying a posi-
tion, cashier of the bank, which made it his business to know
the financial condition of the people, he could have arrived at
a fair estimate of their value by an examination of them; but
he contented himself with a very cursory examination of the
stock of drugs about which he knew nothing, never having
had any experience in the business and was unable to speak
of the value of the accounts purchased by him, only he said
Faulconer esimated them at from one thousand dollars to two
thousand dollars.    In *Livesay* v. *Beard,* 22 W. Va. 585 (Syl.
pt. 5), it is held: "Where the facts and circumstances in any
case are such as to make a *prima facie* case of fraudulent in-
tent, they are to be taken as conclusive evidence of such intent,
unless rebutted by other facts and circumstances in the case;"
and point 7, "Where a debtor in failing circumstances con-
veys property for a grossly inadequate consideration that is evi-
dence of fraudulent intent."    It is clear that Jordon pur-
chased at much less than the value of the property purchased;
that he knew Faulconer's failing financial condition, and that
he knew that he was not paying an adequate price and that he
was getting all the property Faulconer had, and that Faul-
coner was selling to keep his property from being taken to pay

his debts, which were pressing him by the plaintiffs, especially the Owens Minor Drug Co. The evidence as to the actual value of the property so sold and conveyed is not very clear, H. Gwinn testified he thinks that they told him that the invoice was something over two thousand dollars, then says the stock was estimated at two thousand five hundred dollars, which included all the old accounts due Faulconer, good and bad. Faulconer put a much lower estimate upon it, but gives no definite figures, but thought it would not bring one thousand two hundred dollars at forced sale; the evidence does not show clearly what the stock invoiced when an inventory was made by Jordon some days after his purchase from Faulconer, for the purpose of his sale to Gwinn, when he sold one-half interest to Gwinn for one thousand two hundred and fifty dollars and retained a half interest himself. The presumption is that Jordon sold by the invoice. The price he sold for is not material, except as it may tend to prove the value of the stock which he purchased from Faulconer. Jordon said he asked Faulconer what estimate he put on his stock and he said he thought he had sixteen or eighteen hundred dollars in the store; this augmented by the value of the accounts estimated at from one thousand dollars to one thousand five hundred dollars or two thousand dollars would run it up to fully two thousand five hundred dollars.

The fourth assignment of error is that the court erred in holding said sale and transfer to Jordon as made with intent to hinder, delay and defraud the creditors of Faulconer, and at the same time decreeing that the sale was for the benefit of all the creditors of Faulconer and referring the cause to a commissioner, and the fifth assignment as follows: "The court erred in holding J. H. Jordon, the purchaser, liable to the creditors of E. N. Faulconer for the sum of two thousand five hundred dollars, when the proof shows that the stock of goods, fixtures, etc., only sold for one thousand three hundred and seventy-six dollars. The court in fixing the value of the same arbitrarily and wrongfully adopted this valuation. The only proof in evidence of the value of said stock, etc., is the sworn deposition of E. N. Faulconer, that the sum paid by Jordon was more than the stock would have brought at a forced sale. Because Jordon in subsequently selling at an advance to Gwinn,

made a profit on his transaction is no reason why the court should arbitrarily fix the value of the stock at this figure," may be treated together. The court having adjudged the sale and transfer to be fraudulent it was error to refer the cause to a commissioner to ascertain the various creditors of defendant E. N. Faulconer, and the amount due each at the date of the sale, no other creditors other than the plaintiff's having appeared to set up their claims and assume their proportion of the costs in the proceeding to set aside the sale as fraudulent. As we have hereinbefore shown it was not necessary to convene the other creditors of the debtor. The sworn deposition of E. N. Faulconer as we have seen is not by any means "The only proof in evidence of the value of said stock, etc." In *Vance Shoe Co.* v. *Haught,* 41 W. Va. 275 (Syl. pt. 4), it is held: "Where a fraudulent purchaser yet owns the property, the creditor must subject it, and can not take a personal, money decree for his debt, or the value of the property, against the purchaser, but if the fraudulent purchaser has sold the property to a *bona fide* purchaser, so that it can not be reached, the creditor may have a money decree against the fraudulent purchaser for the amount he received for the property, or if that be less than its actual value, then for such value; and, if the *bona fide,* purchaser yet owes for the property, the money in his hands may be followed, and subjected in his hands." *Hinton* v. *Ellis,* 27 W. Va. 422. The decree in favor of the plaintiff for the full amount found due them respectively was proper but the money decree for two thousand five hundred dollars against Jordon was error. He could be held liable in such suit only for the debts represented therein. The sixth, seventh and eighth assignments are to the same effect, that is, that the court erred in holding said sale to be a preference operating for the benefit of all the creditors of Faulconer without allowing Jordon preference for the cash payments made by him for the stock, and refusing to substitute Jordon, the purchaser, to the prior liens by execution which he had paid off and which were listed in the deposition of Faulconer and according Jordon the priority thereof, and in not giving him a preference over the general creditors for the bank debt of seven hundred and fifty dollars and the other debts paid by him. In *Bank* v. *Wilson,* 25 W. Va. 243, it is held:

That if a deed be set aside as fraudulent and void, as to creditors, because made with intent to hinder, delay and defraud such creditors and a part of the consideration of such deed was the satisfaction of a *bona fide* debt due from the grantor to grantee, such fraudulent grantee is not entitled to charge the land thereby attempted to be conveyed with the amount of such debt. *Goshorn* v. *Snodgrass,* 17 W. Va. 717; *Webb* v. *Ingham,* 29 W. Va. 389; *Livesay* v. *Beard,* 22 W. Va. 585; Hoggs Eq. Pr., sec 198; *Spencer* v. *Smith,* 34 W. Va. 697 (12 S. E. 28) ; *Clark* v. *Gordon,* 25 W. Va. 735 (14 S. E. 255) ; and as to the substitution see *Bates* v. *Swiger,* 40 W. Va. 420; Sheld on Subs, sec. 44; *Railroad Co.* v. *Soutter,* 13 Wall 517. The ninth assignment is that the court erred in not sustaining the exceptions of defendants to the deposition of R. F. Dunlap. It does not appear from the record that these exceptions were either called to the attention of, or passed upon by the court. In *Vanscoy* v. *Stinchcomb,* 29 W. Va. 263 (Syl. pt. 2), "Exceptions to a deposition (except upon the ground of incompetency, when no exception is necessary), if not brought to the notice of the court below or passed upon by that court, should be considered by the appellate court as having been waived, and a general decree against the party making the exception cannot be considered as involving a decision upon the exception." *Fant* v. *Miller,* 17 Grat 187; *Hill* v. *Proctor,* 10 W. Va. 59.

The tenth assignment of error in decreeing against Jordon personally for the entire debts due the plaintiffs without ascertaining what amount would be distributable on said debts *pro rata* between them after allowing Jordon preference for the money paid out by him on the liens, debts, etc., is not well taken for the reasons stated on former assignments. The eleventh assignment that the court erred in entering any decree whatever, in the cause after learning of Faulconer's adjudication in bankruptcy and because Faulconer's trustee in bankruptcy was not before the court and because from Faulconer's petition filed before final decree it was shown that the plaintiff's debts were included in the said bankrupt schedule in the bankruptcy proceedings. There is nothing in the record to show the bankruptcy proceedings claimed by defendant Faulconer, except the petition itself, which is not sworn to,

and is not accompanied by any evidence of the filing of the petition in bankruptcy; nor of the adjudication of the bankruptcy of petitioner. The allegations of the petition are denied by the general replication of the plaintiff, and there is nothing to support the petition. In *Howes* v. *Holmes*, 81 Mo. App. 81 (Syl. pt. 2), it is held: "An adjudication of bankruptcy will not compel a stay of proceedings in a suit against the bankrupt in a state court upon motion and production of a certificate of adjudication." And in which case it is said in the opinion of the court, "Nothing in the bankrupt law operates to oust this court of its jurisdiction already acquired in the absence of a restraining order from the bankrupt court." For the foregoing reasons the decree of February 14, 1901, should be reversed in so far as it decrees Jordon liable for two thousand five hundred dollars to the creditors of E. N. Faulconer and refers the cause to a commissioner for report, and in all other respects it should be affirmed.

DENT, JUDGE, (*dissenting*):

Faulconer was bound to sell his property or permit it to be sold by the officers of the law. There were judgments against him, creditors were pressing, and without a moment's warning he could have been closed up. To let it be sold would have entailed great loss. Jordan was the only buyer. He offered a fair price, more than it would bring at forced sale, and without expense.

So he made the sale, which is held entirely free from actual fraud. A large portion of the purchase money had to be applied on liens, leaving a balance of little more than sufficient to pay off the bank debt. Jordan could not pay this over to Faulconer without laying himself open to the charge of aiding him to delay, hinder and defraud his creditors. So he asked Faulconer what he should do with this money, and he told him to pay off the bank debt. This was perfectly natural, as the bank debt was a debt of honor, while the other debts were owed to parties who had been making a profit out of his business. The common law permitted him to make this application. The amount applied was simply a claim he held against Jordan for a balance, and which the statute exempts

from the provisions thereof, and permits him to apply to the payment of pre-existing debts. As to this sum, he had the right to prefer one creditor to another. To bring such preference within the meaning of the statute the court must hold that it was the inducement that brought about the sale. That is, that the sale would not have been made if it had not been for the purpose of securing such preference. That Jordan purchased and Faulconer sold with this end in view. Faulconer and Jordan both swear positively that they neither had such end in view. To hold to the contrary we must reject their sworn testimony and regard them guilty of false swearing simply from the fact that Faulconer had the balance so applied instead of dividing it *pro rata* among all his creditors, none of whom would have been greatly benefited thereby. It seems to me the facts and circumstances in so far as adverse thereto are wholly insufficient to overcome their positive testimony, sustained by the numerous facts and circumstances supporting the same, among which is the most potent fact, that Faulconer was bound to make this sale or permit his property to be sacrificed at public sale. It may be that they testified falsely, but the facts and circumstances are not sufficiently adverse to them to justify me in so holding. If their testimony is rejected the fraud charged in the bill is fully established.

If the sale had been perfectly voluntary on Faulconer's part, and he had not been pressed to the wall and forced to make it as a last resort, I might reach a different conclusion. His purpose in selling was to save himself as far as possible, and it was therefore meritorious. Having made a lawful sale he had the right to apply the surplus proceeds to any of his debts he saw fit, without subjecting any of his creditors to the charge of obtaining or securing an unlawful preference.